**2013-1410**

# United States Court of Appeals
# for the Federal Circuit

NASSAU PRECISION CASTING CO., INC.,

*Plaintiff-Appellant*,

v.

ACUSHNET COMPANY, INC., COBRA GOLF COMPANY,
and PUMA NORTH AMERICA, INC.,

*Defendants-Appellees.*

*Appeal from the United States District Court for the Eastern District of
New York in Case No. 10-Cv-4226,
Judge William F. Kuntz, II*

**BRIEF FOR DEFENDANTS-APPELLEES.**

JOSHUA C. KRUMHOLZ
BENJAMIN M. STERN
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA  02116
(617) 523-2700

*Attorneys for Defendants-Appellees*

December 20, 2013

Form 9

**FORM 9.   Certificate of Interest**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Nassau Precision Casting _____ v. Acushnet Company _____

No. 2013-1410

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Acushnet Co, Cobra, Puma _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Acushnet Company
Cobra Golf Company
Puma North America, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Alexandria Holdings Corporation

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Joshua C. Krumholz, Benjamin M. Stern, Steven D'Alessandro (formerly), And Peter Sandborn (formerly), Holland & Knight LLP

12/20/13 _____

Date

/s/Joshua C. Krumholz _____

Signature of counsel

Joshua C. Krumholz _____

Printed name of counsel

Please Note: All questions must be answered
cc: All counsel of record _____

# **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ................................................................i

TABLE OF AUTHORITIES ...................................................................v

TABLE OF ABBREVIATIONS AND CITATION FORMS ............................. viii

STATEMENT OF RELATED CASES ....................................................1

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE...............................................................2

STATEMENT OF FACTS ...................................................................2

    I.     The '000 Patent ................................................................2

    II.    The Manufacturing and Design Methods of the Accused Clubs ..........7

SUMMARY OF THE ARGUMENT ......................................................10

ARGUMENT ...................................................................................14

    I.     STANDARD OF REVIEW AND LEGAL PRINCIPLES .................14

    II.    ACUSHNET DID NOT "REMOVE" OR "RELOCATE"
         "CONSTRUCTION MATERIAL".......................................15

        A.    The Claimed Method Requires the Physical Removal and
            Relocation of "Construction Material," Which Acushnet
            Did Not Do .................................................................16

            1.    The Claims, When Properly Construed, Require
                the Physical Movement of a Substance .........................16

                a.    The Intrinsic Record Supports Acushnet's
                    Construction .......................................................16

                b.    The Extrinsic Record Supports Acushnet's
                    Construction .......................................................20

2. Nassau Has Failed to Adduce Any Evidence that the Heads of the Accused Clubs Were Made By "Removing" and "Relocating" "Construction Material" ........................................................22

B. Even If the Claims Are Construed to Claim a Design Method, They Still Are Not Infringed .......................................23

C. The Marketing Materials Do Not Save Nassau's Claims .........25

D. The Specifications of the Soracco Patents Do Not Disclose How the Accused Clubs Were Made or Designed.................................................................................26

E. Nassau's Newly Asserted Doctrine of Equivalents Argument is Unavailing ............................................................27

III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT ON CLAIM 2 OF THE '000 PATENT ......................................................31

IV. ACUSHNET IS ENTITLED TO SUMMARY JUDGMENT ON CLAIM 1 OF THE '000 PATENT.............................................37

A. The Accused Clubs Do Not Meet the "From a Location Not Used During Ball-Striking Service" Limitation ...............37

B. Acushnet Does Not Meet the "No Adverse Consequence" Limitation ................................................................................38

1. The "No Adverse Consequence" Limitation is Indefinite ........................................................................38

2. The "No Adverse Consequence" Limitation is Not Met Where Nassau Failed to Test the Accused Clubs for That Limitation .............................................42

C. Under Nassau's Construction, Half of the Accused Clubs Cannot Meet the "From a Location Not Used During Ball-Striking Service" and "No Adverse Consequence" Limitations ................................................................................48

V. CONCLUSION ...............................................................................49

CERTIFICATE OF COMPLIANCE........................................................50

CERTIFICATE OF SERVICE ...............................................................................51

# TABLE OF AUTHORITIES

**CASES**                                                    **Page(s)**

*Allianz Ins. Co. v. Lerner*,
   416 F.3d 109 (2d Cir. 2005) ...................................................28, 29, 33

*Amgen Inc. v. F. Hoffman-LA Roche Ltd.*,
   580 F.3d 1340 (Fed. Cir. 2009) ...................................................39, 41

*Aslanidis v. U.S. Lines, Inc.*,
   7 F.3d 1067 (2d Cir. 1993) .......................................................28, 29, 33

*Atmel Corp. v. Information Storage Devices, Inc.*,
   198 F.3d 1374 (Fed. Cir. 1999) ...........................................................39

*Bogle-Assengai v. Connecticut*,
   470 F.3d 498 (2d Cir. 2006) ...................................................28, 29, 33

*Cordis Corp. v. Medtronic Ave., Inc.*,
   511 F.3d 1157 (Fed. Cir. 2008) ..........................................................47

*Cybor Corp. v. FAS Tech., Inc.*,
   138 F.3d 1448 (Fed. Cir. 1998) ...................................................14, 36

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005) ...................................................39, 41

*Datascope Corp. v. SMEC, Inc.*,
   879 F.2d 820 (Fed. Cir. 1989) ...........................................................15

*Davis v. Brouse McDowell, L.P.A.*,
   596 F.3d 1355 (Fed. Cir. 2010) ...................................................26, 36

*Dynacore Holdings Corp. v. U.S. Phillips Corp.*,
   363 F.3d 1263 (Fed. Cir. 2004) ..........................................................14

*Ethicon Endo-Surgery v. United States Surgical Corp.*,
   93 F.3d 1572 (Fed. Cir. 1996) ...........................................................15

*Geneva Pharma, Inc. v. GlaxoSmithKline PLC*,
   349 F.3d 1373 (Fed. Cir. 2003) ..........................................................41

*Glaxo Group v. TorPharm, Inc.*,
   153 F.3d 1366 (Fed. Cir. 1998) .........................................................................15

*Haliburton Energy Servs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) .........................................................................39

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008) .........................................................................19

*Honeywell Int'l Inc. v. Int'l Trade Comm'n*,
   341 F.3d 1332 (Fed. Cir. 2003) ...................................................................42, 47

*Innogenetics, N.V. v. Abbott Labs.*,
   512 F.3d 1363 (Fed. Cir. 2008) .........................................................................28

*Lazare Kaplan, Inc. v. Photoscribe Tech., Inc.*,
   628 F.3d 1359 (Fed. Cir. 2010) ...........................................................28, 29, 33

*Lighting Ballast Control LLC v. Philips Elec. North Amer. Corp.*,
   500 Fed. Appx. 951 (Fed. Cir. 2013)..................................................................14

*Loral Fairchild Corp. v. Sony Corp.*,
   181 F.3d 1313 (Fed. Cir. 1999) .........................................................................29

*Major League Baseball Properties v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ..............................................................................26

*Morton Int'l Inc. v. Cardinal Chem. Co.*,
   5 F.3d 1464 (Fed. Cir. 1993) .............................................................................38

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
   491 F.3d 1342 (Fed. Cir. 2007) .........................................................................26

*Process Control Corp. v. HydReclaim Corp.*,
   190 F.3d 1350 (Fed. Cir. 1999) .........................................................................47

*Research Corp. Tech., Inc. v. Microsoft Corp.*,
   627 F.3d 859 (Fed. Cir. 2010) ...........................................................................27

*Rexnord Indus., LLC v. Kappos*,
   705 F.3d 1347 (Fed. Cir. 2013) .........................................................................15

*Rohm and Haas Co. v. Brotech Corp.*,
   127 F.3d 1089 (Fed. Cir. 1997) ...................................................................26, 36

vi

*S3 Inc. v. Nvidia Corp.*,
   259 F.3d 1364 (Fed. Cir. 2001) ..........................................................39

*Southwall Techs., Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ...........................................................27

*Tip Systems LLC v. Phillips & Brooks/Gladwin, Inc.*,
   529 F.3d 1364 (Fed. Cir. 2008) ..........................................................22

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ...........................................................36

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
   442 F.3d 1322 (Fed. Cir. 2006) ..........................................................14

*Zelinski v. Brunswick Corp.*,
   185 F.3d 1311 (Fed. Cir. 1999) ..........................................................36

## TABLES OF ABBREVIATIONS AND CITATION FORMS

1.    **ABBREVIATIONS**

The following abbreviations are used in this brief, unless otherwise indicated:

| Abbreviation | Explanation |
|---|---|
| '000 Patent | U.S. Patent No. 5,486,000 |
| Accused Clubs | Cobra S9, Cobra S9 Second Generation, King Cobra UFi, and Cobra S2 golf club irons, individually and collectively |
| Acushnet | Defendants-Appellees Acushnet Company, Inc., Cobra Golf Company, Puma North America, Inc., collectively |
| Acushnet Co. | Acushnet Company, Inc. |
| Chorne | Robert Chorne, Nassau's sole employee and named inventor on the '000 Patent |
| Cobra | Cobra Golf, Inc. |
| Nassau | Plaintiff-Appellant Nassau Precision Casting Co., Inc. |
| Parente | Richard Parente, Nassau's liability expert |
| Preece | Tom Preece |
| Puma | Puma North America, Inc. |
| Roach | Ryan Roach |
| USPTO | United States Patent and Trademark Office |

2.    **CITATION FORMS**

The following citation forms are used in this brief:

| (JA __) | Citation to the Joint Appendix at the page number identified. |
|---|---|
| (JA __ (__:__-__:__))<br><br>(JA __ (¶ __)) | Citation to transcript testimony, to a line and column of a patent or to a specific numbered paragraph. Specific transcript lines or patent cites are cited immediately after each |

| | |
|---|---|
| | Joint Appendix page reference, *e.g.*, (JA1 (1:15-2:5)) refers to an excerpt from a transcript beginning on Joint Appendix page 1 starting at transcript page 1, line 15 and continuing through transcript page 2, line 5. Specific numbered paragraphs are cited immediately after each Joint Appendix page, *e.g.*, (JA1 (¶ 1)) refers to numbered paragraph 1 on Joint Appendix page 1. |
| (NB at __) | Citation to Nassau's Opening Brief at the page number identified. |

## STATEMENT OF RELATED CASES

No other appeal in or from this civil action was previously before this or any other appellate court.  There is no case known by Acushnet to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF JURISDICTION

Nassau's jurisdictional statement is correct.

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly granted summary judgment of non-infringement on Claims 1 and 2 of the '000 Patent where the undisputed record demonstrates that Nassau has not, and cannot, meet its burden of proving that the Accused Clubs were made or designed by "removing" and "relocating" "construction material" on the head of a golf club, as both claims require.

2.     Whether the district court correctly granted summary judgment of non-infringement on Claim 2 of the '000 Patent where Acushnet did not relocate to the bottom of the club head all of the "weight" removed from the top of the club head, as that claim requires.

3.     Whether the district court correctly granted summary judgment of non-infringement on Claim 1 of the '000 Patent where "weight" was taken from a ball-striking location, and where the "no adverse consequence" limitation is, as

Nassau admits, indefinite, and, if not indefinite, Nassau has not performed the testing it admits is necessary to prove infringement of that limitation.

## STATEMENT OF THE CASE

Nassau's statement of the case is materially accurate, with several minor qualifications.  Nassau implies that the Accused Clubs are still being manufactured and sold in the United States.  Acushnet Co. sold Cobra to Puma on April 16, 2010 and, as a result, Acushnet Co. stopped manufacturing, selling or offering for sale any of the Accused Clubs approximately as of that date.  (JA82)  Puma never manufactured, sold or offered for sale the S9, S9 Second Generation or King Cobra UFi golf club irons in the United States, and it no longer manufactures, sells or offers for sale the S2 golf club irons in the United States.  (JA83)  In addition, the district court dismissed Acushnet's counterclaim of invalidity as moot and without prejudice.  (JA47)

## STATEMENT OF FACTS

### I.    The '000 Patent

The '000 Patent is directed toward a method for making the head of a golf club iron by "removing" "construction material" from the top of the head and "relocating" that material toward the sole of the head.[1]  As the specification explains, "[t]he significant difference [between the invention and the prior art]

---

[1] The "sole" describes the lower portion of a golf club head.  The "heel" is the back and the "toe" is the front of the head.  (JA240 at n. 3)

2

is . . . the removal of . . . construction material . . . as denoted by area 38 illustrated in phantom perspective."



(JA52 (3:10-15, Figs. 7 & 10))  In the figures above, "construction material" is "removed" from 38 and "relocated" to 40.  (*Id.* at 3:10-20)

According to the patent, "construction material" is "removed" and "relocated" from the top to the bottom of the club head to "improve weight distribution" by lowering the center of gravity of the club head.[2]  (*Id.* at 4:17-32)  It has long been known that, by lowering the center of gravity of a golf club head (with all else being equal), a struck golf ball will fly higher, which is the goal of the '000 Patent.  (JA537 (36:7-25); JA659 (202:4-203:6); JA660 (206:7-207:9); JA662 (215:8-22); JA663 (219:9-20))  Indeed, it is a basic principle of physics.  In fact, as Nassau's expert acknowledges, *all* of the principles underlying the '000 Patent have been known for decades.[3]  (JA536 (32:2-13); JA536-37 (33:3-34:4); *see also* JA659-60 (204:19- 206:3); JA662-64 (214:13- 222:6); JA291-95 (¶¶ 38,

---

[2] The center of gravity is the single point within the club head (or any object) that represents the intersection of all the balance points of the head.  (JA289 (¶ 34))

[3] That may be why Nassau's expert acknowledged that the only novelty that can be found in the '000 Patent is in the unasserted dependent claims, which disclose a concave shape at the top of the club head.  (JA551 (171:21-173:3))

45))

In 1984, for example, the golf club maker Hogan Golf Company, in developing its Magnum line of golf clubs, physically removed steel from the center topline and welded that steel to the sole of the head to lower the center of gravity and increase the trajectory of a struck golf ball.  (JA306-08 (¶¶ 69-74))



(*Id.*)[4] (annotations added)  As the above image demonstrates, the Magnum iron that resulted from the aforementioned removal and relocation process had almost no steel in the topline at all; most of the steel that was there was physically removed and relocated to the sole during the design process.  (*Id.*)

Similarly, U.S. Patent No. 4,938,470, issued in 1988 to Antonious, describes removing material from the central portion of the topline of a club head and relocating that material to lower positions adjacent to the heel and toe.  (JA754-56 (1:50-2:29, 4:4-17, 5:12-51))

---

[4] Physical samples of this club, and all other clubs described in this brief, are part of the summary judgment record before the district court.  Although Acushnet believes that the pictures in this brief are sufficient, it will submit the physical clubs upon this Court's request.



FIG.7

(JA752 (Fig. 7))  In the figure above, the straight top edge reflects removed material that is relocated to the elements 444 and 442.  (*Id.*; JA755 (4:4-17, 4:38-42))

Nevertheless, in the district court action, Nassau has accused Acushnet of infringing Claims 1 and 2 of the '000 Patent, where these basic principles of physics can be found.  Claim 1 recites:

> In a golf iron club head of a type having a ball-striking body of weight-imparting construction material inclined at a selected angle for driving a struck golf ball a corresponding selected height during its trajectory, said body having spaced-apart top and bottom surfaces bounding a ball-striking surface therebetween, the **method** of improving weight distribution comprising **removing construction material** from said top surface, **relocating said removed construction material** from said top surface to **clearance positions** below said top surface located adjacent opposite ends of said bottom, [sic] surface whereby said removed construction material **from a location not used during ball-striking service** of said golf iron, is of **no adverse consequence** thereto and said removed construction material in said relocated positions contributes to **increasing said height attained by a struck golf ball**.

(JA52 (4:17-32)) (emphasis added)  Breaking down the various elements, Claim 1 recites a method of making a club head in which:

- "construction material" is removed from a location at the "top surface" of the golf club head;

- the "removed material" must be "from a location not used during ball-striking service";

- the removed material is relocated to "clearance positions" that are below the "top surface" and towards the heel and toe of the club head;

- a struck golf ball attains greater "height" as a result of the removal and relocation of the material; and

- there is "no adverse consequence" as a result of that removal and relocation.

Claim 2 recites:

> A **method** of improving the weight-distribution of a selected construction material constituting a golf club iron head with a ball-striking surface bounded in a vertical perspective by the top and bottom surfaces and in a horizontal perspective by toe and heel portions of said method comprising **the steps of removing construction material** from a central portion of said top surface, **determining the weight of said removed construction material, and embodying as part of selected bottom areas of said toe and heel of said club head said removed construction material having said determined weight**, whereby the weight is distributed to said selected bottom area **without any increase in the overall weight** of the club head.

(JA52 (4:33-45)) (emphasis added)  Claim 2 varies from Claim 1 primarily in that:

(a) it does not contain the "from a location not used during ball-striking service" and "no adverse consequence" limitations; (b) it requires that the overall weight of

the club head remain constant; (c) it requires that the "construction material" be removed from the center of the top surface of the club; (d) it requires that the relocated material be of a "determined weight" equal to the weight of the removed material; and (e) it does not require that a struck golf ball have an "increased height."

## II.    The Manufacturing and Design Methods of the Accused Clubs

Nassau has accused Acushnet of practicing the methods disclosed in Claims 1 and 2 through the design and/or manufacture of the Accused Clubs.  (JA73 (¶¶ 14, 18))  The manufacturing process for the Accused Clubs involved the casting of a metal club head in a single piece from a wax mold.  (JA518 (¶ 4); *see also* JA468-70 (¶¶ 44-46))  Pursuant to that process, the mold was crafted as a single piece, from which a single piece of steel was cast.  (JA518 (¶ 4); JA468-70 (¶¶ 44-46))  Importantly, the process did *not* involve the removal of any material from the top surface of the club head (or anywhere else).  (*Id.*; JA717 (33:3-5); JA719 (44:25-45:2); JA721 (57:13-19); JA725 (80:11-19))  Indeed, at no point during this process was any material of any kind relocated from one position on the club head to another.  (JA518 (¶ 4); JA468-70 (¶¶ 44-46); JA717 (33:3-5); JA719 (44:25-45:2); JA721 (57:13-19); JA725 (80:11-19); JA1171 (41:6-23))

7



Wax mold with channel in top of club head

Steel casting with channel in top of club head

(JA518 (¶ 4))

The record is likewise clear with respect to the design process for the Accused Clubs. No "weight" was "removed" or "relocated" at any point during the design process. (JA717 (33:3-5); JA725 (80:11-19)) Preece, Cobra's head of Research & Development, and Roach, the designer of the Accused Clubs,[5] both testified that the design process did *not* involve the "removing" of "weight." (JA725 (80:11-19); JA1171 (41:6-23)) Roach, for example, noted that "weight [in the S2] is designed into the heel and toe from the beginning. . . . *[T]here's nothing moved about it.*" (JA725 (80:11-19); *see also* JA717 (33:3-5) ("there was never any weight [at the S9 top line] . . . to distribute . . . *we're creating a design, we're not . . . creating a design and then taking something away*"); JA719 (44:25-45:2)

---

[5] Nassau incorrectly claims that Peter Soracco ("Soracco"), an Acushnet employee, "developed" the Accused Clubs. (NB at 10) That is wrong; Roach designed the Accused Clubs. (JA717 (32:13-20))

("the weight [of the S9] isn't being reduced [at the topline] because . . . *the design never had metal up there to begin with*"); JA721 (57:13-19) ("our design process isn't something that . . . takes away. . . [I]t adds up. . . *[W]e place the weight where we need to . . . at the outset of the design.*")) (all emphasis added)  Although he deferred to Roach on the specifics of the design process, Preece confirmed this assessment.  (JA1171 (41:6-23); *see also* JA725 (80:11-19))

The only evidence upon which Nassau relies to establish the contrary are marketing materials.  (NB at 44-46)  As the undisputed record reveals, however, those materials explain only the benefits of the irons when compared to competitors' clubs, not the manner in which the irons were manufactured or designed.  (JA722 (58:7-13); JA730 (110:7-113:6))  Indeed, Nassau and its expert admit that those marketing materials ***cannot*** be relied upon to establish the actual manufacturing or design processes used for the Accused Clubs.  (JA564 (245:2-11); JA590-91 (409:22-410:3); JA664 (222:16-223:2, 224:13-16))

For example, Nassau's expert, Parente, testified that "you *cannot* look at marketing [materials] and take it for granted" how a product was designed or manufactured.  (JA564 (245:2-11)) (emphasis added)  Similarly, Chorne, the named inventor of the '000 Patent and Nassau's Rule 30(b)(6) witness, noted that "*what one says in an advertisement and what reality is, is a lot of times two different things. . . .*  So I don't go by the advertisement."  (JA664 (222:21-25); *see*

9

*also* JA664 (224:13-14) ("*I don't go by advertisement[s].*  I go by reality.")) (all emphasis added)

In large part because Nassau's experts limited themselves to a review only of the finished clubs, they have no idea how the Accused Clubs were actually manufactured or designed.  (JA549 (140:10-22); JA557 (200:22-201:22); JA702 (51:14-18); JA703 (70:4-13))  As such, Nassau has not adduced any credible evidence regarding the actual manufacturing or design processes Acushnet used for the Accused Clubs.

## SUMMARY OF THE ARGUMENT

The '000 Patent claims a method for, *inter alia*, "removing" and "relocating" "construction material" from the top of a golf club head to portions lower in the head.  All of the intrinsic and extrinsic evidence supports Acushnet's proposed construction that the claimed method contemplates a physical process in which physical "construction material" is moved.  To read the claims as Nassau (and the district court) did, and to construe the different claim terms "construction material" and "weight" as synonymous, would render the claims nonsensical, violate basic claim construction principles and contradict the intrinsic and extrinsic record.

Acushnet cannot, as a matter of law, be found to infringe the asserted claims of the '000 Patent because Nassau failed to adduce any competent evidence to show that "construction material" was "removed" or "relocated" during the making

10

of the Accused Clubs. In fact, the heads of the Accused Clubs were made by casting them in a single piece from a wax mold. No "removing" or "replacing" of material was involved.

Even assuming that the district court was correct and that the '000 Patent claims a method of designing (not constructing) a golf club head, and that the asserted claims merely require the "removal" and "relocation" of "weight," Nassau's claims still fail as a matter of law. The only competent record evidence is that, during the design process, no "weight" is "removed" or "relocated." "Weight" is designed into the club head from the outset, not moved during the process of designing the head.

Unperturbed by this strong and unrebutted evidence, Nassau argues that unrelated and later-filed apparatus patents are evidence of the processes used by Acushnet to make and/or design the heads of the Accused Clubs. This argument, however, is akin to looking at a house and claiming to know the order in which the walls were erected. Apparatus claims disclosing a final product do not disclose the process by which the product was made.

Nassau also claims that Acushnet's marketing materials, which extol the benefits of a polymer insert in the topline of the Accused Clubs, somehow disclose Acushnet's design and/or manufacturing processes. This attorney argument, however, is belied by the record evidence, which demonstrates that Acushnet's

11

marketing materials were not intended to, and did not, explain either process. In fact, both Chorne, the named inventor of the '000 Patent, and Parente, Nassau's expert, have stated that those materials cannot be used in the way that Nassau is now trying to use them.

Additionally, the plain language of Claim 2 of the '000 Patent requires that the "weight" of the removed construction material be "determined," and that this "determined" amount of "weight" be relocated lower down in the club head, such that the overall weight of the head does not change. As the district court found, however, there is no dispute that "each of the Accused Clubs incorporates a polymer insert along the top surface of the club head" and that only the "difference [in weight] between the insert and the construction material" could have been redistributed. Because the overall weight of the club head remains the same, only a portion of the "determined" weight in the Accused Clubs could have been relocated. Thus, the district court found that some of the "determined" weight remains behind in the form of the polymer insert. Summary judgment as to Claim 2 of the '000 Patent therefore was appropriate for this reason as well.

With regard to Claim 1, the district court properly found that material was not "removed" "from a location not used during ball-striking service." Nassau claims that Acushnet removed material from behind the top face of the club head. The undisputed evidence establishes that golfers hit balls at the top of the face of a

12

club head.  As such, even under Nassau's theory, because material is removed from a location where balls are in fact struck, the "removed" material *is* taken from a location used "during ball-striking service."

Nassau also fails with regard to the "no adverse consequence" limitation in Claim 1.  As an initial matter, the "no adverse consequence" limitation is hopelessly indefinite.  As even Nassau's expert admits, a determination of whether there is an "adverse consequence" is an entirely subjective exercise, which is up to each individual golfer for a particular shot.  That subjectivity is the epitome of indefiniteness, and hardly provides the objective standard required to meet the notice function of a patent.

Further, whatever "no adverse consequence" may mean, Nassau has not, and cannot, meet its burden of proof as to that limitation.  The alleged removal and relocation of steel in a club head from the topline to lower in the head invariably has a material impact on certain shots.  As Nassau's expert admits, the only way to determine whether that impact is "adverse" is to test the club heads.  Nassau, however, failed to conduct a single test on any of the Accused Clubs.  Because it failed to even meet the requirements of its own expert, summary judgment is appropriate on that ground as well.

In response, Nassau suggests for the first time that the removal of "construction material" is of "no adverse consequence" if the removal comes from

13

only the top middle of the club head because, Nassau reasons, golfers do not hit the ball at that location.  The undisputed record, however, shows that assumption to be factually incorrect and is, in fact, contradicted by Nassau's own infringement claims, which include claims against two club heads with material allegedly removed from the upper and middle toe portion of the club head.  Under Nassau's new construction, those clubs cannot meet this limitation.  As such, each of Nassau's claims fail.

## **ARGUMENT**

## I.     **STANDARD OF REVIEW AND LEGAL PRINCIPLES**

This Court reviews a grant of summary judgment *de novo*.  *See, e.g.*, *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326 (Fed. Cir. 2006); *see also Dynacore Holdings Corp v. U.S. Phillips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004).  In reviewing summary judgment opinions where the district court engaged in claim construction, this Court's *de novo* review includes construing the claims of the patent-in-suit.  *See Cybor Corp. v. FAS Tech., Inc.*, 138 F.3d 1448, 1454-55 (Fed. Cir. 1998).[6]

---

[6] As Nassau correctly notes (NB at 19 n. 5), this Court has agreed to an *en banc* review of whether *Cybor Corp.* should be overruled and whether any deference should be afforded to a district court's claim construction.  *See Lighting Ballast Control LLC v. Philips Elec. North Amer. Corp.*, 500 Fed. Appx. 951 (Fed. Cir. 2013).  Should this Court adopt a different standard of review of the district court's claim construction ruling, Acushnet requests that it be allowed to provide a supplemental brief addressing the changed standard, to the extent necessary.

## II.    ACUSHNET DID NOT "REMOVE" OR "RELOCATE" "CONSTRUCTION MATERIAL"

In conducting its *de novo* review, this Court is free to affirm a summary judgment on any ground supported by the record. *See Rexnord Indus., LLC v. Kappos*, 705 F.3d 1347, 1356 (Fed. Cir. 2013) ("[o]n judicial review, the correctness of the decision appealed from can be defended by the *appellee* on any ground that is supported by the record, whether or not the appellant raised the argument") (citing cases) (emphasis in original); *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 822 n. 1 (Fed. Cir. 1989) ("Appellees always have the right to assert alternative grounds for affirming the judgment that are supported by the record"); *Glaxo Group v. TorPharm, Inc.*, 153 F.3d 1366, 1371-72 (Fed. Cir. 1998) ("When a matter comes before an appellate court following a summary judgment, the appellate court is free to adopt a ground advanced by an appellee in seeking summary judgment but not adopted by the trial court"); *Ethicon Endo-Surgery v. United States Surgical Corp.*, 93 F.3d 1572, 1582 (Fed. Cir. 1996) ("[w]e *must* affirm the decision of the district court if it is supported by *any* ground properly preserved on appeal") (emphasis added).

Here, alternative bases either rejected or not addressed by the district court compel affirmance of its summary judgment ruling. Specifically, in construing the claims, the district court concluded that Claims 1 and 2 claim a method of designing, and not constructing, a club. (JA36) In so holding, the district court

15

concluded that the terms "weight" and "construction material" are synonymous.

(JA39)  That holding, however, is inconsistent with the intrinsic and extrinsic

record and contradicts basic claim construction principles.  In any event, whether

viewed as a substance or merely "weight," and whether the method claims a

manufacturing or design process, Acushnet did not "remove" or "relocate"

"construction material."

> ### A. The Claimed Method Requires the Physical Removal and Relocation of "Construction Material," Which Acushnet Did Not Do
>
>> #### 1. The Claims, When Properly Construed, Require the Physical Movement of a Substance
>>
>>> ##### a. The Intrinsic Record Supports Acushnet's Construction

There is no dispute that the '000 Patent claims a method of creating the head

of a golf club iron – and does not claim a head itself.  Nassau admits as much.  (NB

at 14 ("[t]he '000 Patent describes and claims *methods* . . ."); *id*. at 20 (". . . *method*

disclosed in the patent . . ."); *id*. at 21 (". . .the purpose of the invention is *to*

*construct* a more forgiving club . . . ."); *id*. ("[t]he '000 Patent teaches a *method* . .

."); *see also* JA1089 ("[Nassau] has asserted claims 1 and 2 of the ['000 P]atent

against [Acushnet], with the relevant *method steps* italicized . . ."); JA1090 ("[t]he

*methods* described [in the '000 Patent] are the same *methods* used by [Acushnet] in

making the accused golf clubs.")) (all emphasis added)

16

The goal of the method is, as Nassau states, to "improv[e] weight distribution." (NB at 21-22; *see also* JA52 (4:22-23)) That goal is achieved in the claimed method by, *inter alia*, "removing" and "relocating" "construction material." (JA52 (4:23-24)) Even in its appellate brief, Nassau admits as much, stating that the "'000 Patent teaches a method of weight distribution in which weight *in the form of construction material (e.g. steel)* is removed . . ." (NB at 21) (emphasis added)

The intrinsic record makes clear that this claimed method involves the physical removal and relocation of a substance. First, the claims themselves require that "construction material" (a physical thing) be "remov[ed]" (a physical act) from the "top surface" of the club head (a physical location) and then be "relocate[ed]" (another physical act) to "clearance positions" on the bottom of the club head (another physical location). (JA52 (4:23-28)) Second, in describing the claimed process, the specification calls for "the removal of the *metal* construction material, or whatever construction material is being used such as *metal per se, graphite or the like*." (*Id.* at 3:11-15) (emphasis added) Third, in comparing the alleged invention to the prior art, the specification discusses the invention in the context of a manufacturing process: "The [prior-art] practice of weight distribution is thus not *followed in the manufacture* of the within [sic] golf club iron 10', and has resulted in a vastly superior ball-striking device." (*Id.* at 3:40-44) (emphasis

17

added)  As the claims and specification make clear, "construction material" is the substance that the club head is actually made of, and it needs to be physically "removed" and "relocated" in order to satisfy all the asserted claims.

The prosecution history further supports this interpretation.  In a September 26, 1994 amendment to overcome prior art cited by the USPTO Examiner, Chorne characterized his invention as "a golf iron club head in which *a determined amount of head material* is removed . . . and is redistributed . . . ."  (JA673) (emphasis added)  Chorne went on to state in that amendment that "[t]he specific relationship between the amount of material removed, and the redistribution of that precise amount of material at other locations on the head, is an improvement in *head construction* which is not taught or suggested by the art of record . . . ."  (*Id.*) (emphasis added)  As such, it is clear that the claimed method contemplates the movement of a physical substance.

In an effort to escape this clear and unambiguous construction, Nassau argued, and the district court accepted, that the '000 Patent actually teaches a design process.  As support for this interpretation, Nassau suggested, and the district court again agreed, that "removing" and "relocating" "construction material" really requires just the shifting or redistributing of "weight" during the design process.  (NB at 9; JA39-40)

18

Nassau's and the district court's construction, however, is inconsistent with the claim language, which clearly does not use the terms "weight" and "construction material" interchangeably.  In fact, under that construction, the following portions of Claims 1 and 2 would be rendered virtually unintelligible:

- "weight-imparting construction material" (Claim 1 preamble);

- ". . . method of improving weight-distribution of a selected construction material" (Claim 2 preamble);

- "determining the weight of said construction material" (Claim 2); and

- "said removed construction material having said determined weight" (Claim 2).

Clearly, as used in the claims, the terms "weight" and "construction material" are not synonymous.  "Weight," in actuality, is a characteristic of "construction material."  Any other construction does violence to the claims themselves.

Further, the district court's construction violates a fundamental precept of claim construction, namely that "different claim terms are presumed to have different meanings." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) (court declined to construe two different terms to have same meaning because of presumption that different claim terms have different meanings).  That is especially true where, as here, the different terms are used in the same limitations.  As such, the intrinsic record demonstrates that Acushnet's

19

interpretation of the '000 Patent as requiring the physical process of "removing" and "relocating" "construction material" – rather than merely the abstract concept of shifting "weight" during the design process – is correct.

### b.    The Extrinsic Record Supports Acushnet's Construction

This Court may look to extrinsic evidence so long as that evidence does not contradict the meaning otherwise apparent from the intrinsic record. *See, e.g.*, *id.* at 1382.  The extrinsic evidence in this case is in accord with Acushnet's interpretation of the '000 Patent and is directly contrary to Nassau's and the district court's interpretation, which improperly equates "construction material" with "weight."

First, the dictionary definitions of "weight" ("a measurement of how heavy a thing is") and "material" ("a substance") are different, and support Acushnet's position that "weight" is a characteristic of "construction material," not an equivalent to it.  (JA710-13)

Second, experts from both sides agree that "construction material" and "weight" have different meanings.  Nassau's own expert, Parente, agrees that "'construction material' . . . refers to the metal or the material of the golf club and if you're talking about the removal of construction material, you're talking about the removal of metal at some point in the manufacturing process."  (JA565 (247:15-248:3); *see also* JA572 (284:7-18))  Indeed, in his expert report, and again

in his deposition, Parente equated "construction material" with "steel" (rather than "weight") and characterized the claimed method as one of "manufacture" (rather than "design").  (JA637-38; JA548 (130:18-131:4))  Acushnet's expert similarly agrees that "weight" and "construction material" are not synonymous.  (*See* JA457 (¶ 22); JA462-64 (¶¶ 32-35))

Third, Nassau points to the specifications of various patents owned by Acushnet to argue that "weight" and "construction material" are interchangeable. For example, Nassau suggests that U.S. Patent No. 7,481,718 (the "'718 Patent") and U.S. Patent No. 7,819,757 (the "'757 Patent") issued to Soracco (collectively, the "Soracco Patents") – neither of which are asserted in this case or are related to the '000 Patent – contemplate that "weight" and "construction material" are interchangeable.  (NB at 36-37)  Although the Accused Clubs embody the Soracco Patents, those patents contain, unlike the '000 Patent, apparatus claims.  (JA1375 (17:32-50); JA1326 (5:26-48))  As such, they claim a physical structure of the club head, not how the club head was made.  They are thus irrelevant to a proper infringement analysis of the methods claimed in the '000 Patent.

Further, the specifications of the Soracco Patents have no bearing on the view of one of ordinary skill in the art at the time of the filing of the '000 Patent. The applications for the '718 Patent and the '757 Patent were filed in 2004 and 2007, respectively, more than ten years after Chorne filed his application for the

21

'000 Patent.  Nassau has not made any showing as to whether the named inventor of the Soracco Patents was a person of ordinary skill in the art, nor has it demonstrated that the prosecution histories of the Soracco Patents have any bearing on the '000 Patent.  *See Tip Systems LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1371 (Fed. Cir. 2008) (prosecution history of patent not appropriate to use to construe claims of different patent where the patents contained different subject matter, were not cited on the face of the asserted patent and were not otherwise related).  Simply plucking isolated words from the specifications of the Soracco Patents hardly constitutes the type of extrinsic evidence that this Court should use to construe the claims of the '000 Patent.

>    **2.    Nassau Has Failed to Adduce Any Evidence that the Heads of the Accused Clubs Were Made By "Removing" and "Relocating" "Construction Material"**

Under a proper construction of the claims, Nassau must establish that some substance in the form of "construction material" was removed and relocated.  Yet, as Nassau's expert admits, Nassau has failed to adduce *any* evidence showing how the heads of the Accused Clubs were *actually* made.  (JA549 (140:13-22) ("**Q:**  Do you know whether [a particular manufacturing step] has ever been done with regard to any of the accused products?  **A.** . . . No."))  In fact, neither of Nassau's experts did anything more than review the drawings of the finished clubs and

examine the clubs themselves.  (JA637; JA702 (51:14-18))  As such, Nassau

simply has adduced no evidence of Acushnet's manufacturing process.

Further, the undisputed evidence demonstrates that Acushnet did not, at any

time, move any substance or material in making the heads of the Accused Clubs.

Rather, the Accused Clubs were made by casting the metal club heads from a wax

mold.  (JA518 (¶ 4); JA468-70 (¶¶ 44-46))  Using that process, the heads were cast

as single pieces.  (*Id.*)  At no point in the process did Acushnet remove any

material from the top surface of the club heads (or anywhere else), nor did it

relocate material anywhere on those heads.  (*Id.*)  As such, Nassau has not – and

cannot – meet its burden with respect to infringement of either Claims 1 or 2 of the

'000 Patent, and summary judgment was appropriate.

### B.    Even If the Claims Are Construed to Claim a Design Method, They Still Are Not Infringed

Under the district court's construction, the claimed method is a design

process that requires the redistribution of "weight."  After construing the claims,

however, the district court never considered Acushnet's argument that, even under

that construction, its design process still did not infringe either asserted claim.

(JA35-40)  Acushnet is entitled to summary judgment on that basis as well.

Like Acushnet's manufacturing process, Nassau has not adduced any

evidence regarding Acushnet's design process.  In fact, Nassau's experts admit that

they have no idea how the clubs were designed.  (JA561 (230:2-9) ("**Q.**  You don't

23

know what the actual design process was for the accused clubs, correct? **A.** I do not know their inside proprietary . . . way of producing their CAD drawings of their inventions."); JA704 (99:13-100:12) ("I don't know how the designer designed the club"))[7]

The undisputed testimony from Preece and Roach – individuals with detailed knowledge of the design process for the Accused Clubs – is that Acushnet's design process *did not* involve redistributing anything, whether it be "construction material," "weight," or anything else. Rather, as Roach, the designer of the Accused Clubs, explains, the weight distribution in the Accused Clubs was designed-in from the beginning; there was no "weight" (or "construction material") moved during the design process. (JA717 (32:22-33:5); JA719 (44:25-45:2) ("the weight [of the Accused Clubs] isn't being reduced [at the topline] because . . . *the design never had metal up there to begin with*") (emphasis added); JA725 (80:11-

---

[7] *See also* JA555-56 (193:23-194:5) ("[**Q.**] Do you have an understanding as to what actually took place during the design process in this instance? **A.** Not being a Cobra designer I cannot tell you what was in their mind."); JA559 (224:11-17) ("**Q.** . . . [Y]ou don't know whether [Cobra] started with [the channel already part of the CAD drawing]? **A.** . . . Whether the channel was there or not there for the original drawing that went up on the screen, probably only the designer can tell you."); JA559 (223:12-24) ("**Q.** [A]ssume that the profile from which the design started did not have weight in the topline that was ultimately put elsewhere during the design process, okay? . . . **A.** . . . I don't know if it did or not."); JA560 (228:5-9) ("not being there, I couldn't tell you . . . what the original profile contained, a channel, [or] no channel."); JA701 (42:24-43:5) ("**Q.** . . . But it's fair to say that based on the IGS files that you reviewed you don't know which way the Cobra designers actually went about designing the golf club? **A.** No.").

24

19))  Preece confirmed the same.  (JA518 (¶ 4); JA1171 (41:6-23))  As such, even under Nassau's construction, it has not met its burden of showing that Acushnet "removed" or "reallocated" "construction material."

### C.    The Marketing Materials Do Not Save Nassau's Claims

Nassau's infringement theory boils down to its claim that, because the Accused Clubs have a channel in the topline that contains a polymer insert instead of steel, Acushnet must have, at some point and in some way, removed steel from that channel to points lower in the club head.  Nassau's primary evidence in support of that assumption are marketing materials that Nassau itself admits are unreliable.  (JA564 (245:2-11); JA590-91 (409:22-410:3); JA664 (222:16-223:2, 224:13-16))

As Acushnet's two principal witnesses have explained, and Nassau has made no effort to refute, the marketing materials upon which Nassau relies do not describe either the design process or the manufacturing process used to create the heads of the Accused Clubs.  (JA730 (110:7-113:6); JA721 (55:7-13))  Rather, the marketing materials attempt to explain the benefits of the Accused Clubs compared to competitors' clubs.  (*Id.*)  Indeed, Nassau and its expert admit as much, acknowledging that the marketing materials cannot be relied upon to establish either process.  (JA564 (245:2-11); JA590-91 (409:22-410:3); JA664 (222:16-223:2, 224:13-16))  As such, those materials are not competent evidence.  *See*

25

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1354-55 (Fed. Cir. 2007) (no proof of infringement where expert opinion was based solely on unreliable interpretation of defendants' marketing materials); *see also Davis v. Brouse McDowell, L.P.A.*, 596 F.3d 1355, 1364 (Fed. Cir. 2010) ("Conclusory statements unadorned with supporting facts" or "unsupported" expert opinions are "insufficient to establish a factual dispute that will defeat summary judgment") (internal citation omitted); *Rohm and Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) ("Nothing in the rules of our jurisprudence requires the fact finder to credit the unsupported assertions of an expert witness."); *Major League Baseball Properties v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment.  An expert's conclusory opinions are similarly inappropriate.") (internal citations omitted).

### D.    The Specifications of the Soracco Patents Do Not Disclose How the Accused Clubs Were Made or Designed

Nassau alternatively argued below, in the face of Roach's and Preece's uncontradicted testimony, that the Soracco Patents, which contain only apparatus claims, describe the process by which the heads of the Accused Clubs were designed and/or manufactured.  (NB at 32-37)  In accepting this argument, the district court suggested that, because the Soracco Patents disclosed a golf club head

with a polymer insert in the topline and a low center of gravity, "construction material" must have been "removed" and "relocated" during the designing of the Accused Clubs.  (JA37-38)  Examining the finished club heads, however, does not disclose the process by which the heads were made, any more than looking at a finished house reveals the order in which the walls were erected.[8]  *See, e.g.*, *Research Corp. Tech., Inc. v. Microsoft Corp.*, 627 F.3d 859, 873 (Fed. Cir. 2010) ("Courts must generally take care to avoid reading process limitations into an apparatus claim . . . because the process by which a product is made is irrelevant to the question of whether that product infringes a pure apparatus claim.") (citation omitted).  As such, Nassau's reliance on the Soracco Patents to create a genuine issue of material fact as to the process by which the heads of the Accused Clubs were made or designed is unavailing.

### E.    Nassau's Newly Asserted Doctrine of Equivalents Argument is Unavailing

Nassau attempts to save its case by arguing that the district court failed to consider whether Acushnet infringed the '000 Patent under the doctrine of equivalents.  (NB at 47-48)  Nassau did not, however, assert an equivalence

---

[8] The appearance of a feature in a finished product *could* reveal the process by which the product was made, if the evidence suggested that there was only one way to create that feature.  *See, e.g.*, *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575-77 (Fed. Cir. 1995) (no infringement where characteristic of product showed that claimed process was not followed).  Nassau offers no such evidence here.

argument to the district court, and may not now assert one for the first time on appeal.

Second Circuit law governs whether Nassau may assert an argument not raised at the district court. *See, e.g.*, *Innogenetics, N.V. v. Abbott Labs*, 512 F.3d 1363, 1371 (Fed. Cir. 2008) (law of regional circuit governs procedural issues not unique to patent law). The Second Circuit has held that arguments that could have been – but were not – raised in opposition to a summary judgment motion in the district court should not be heard for the first time on appeal. *See Bogle-Assengai v. Connecticut*, 470 F.3d 498, 504, 506 (2d Cir. 2006) (declining to address argument made for first time on appeal where defendant raised issue below on summary judgment but plaintiff failed to address it in summary judgment opposition, even though plaintiff "had every incentive to do so"); *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005) (declining to hear two arguments that were "available . . . below" but were made for the first time on appeal); *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1077 (2d Cir. 1993) (holding that party opposing summary judgment must "raise all arguments against such remedy in the trial court and may not raise them for the first time on appeal") (internal citations omitted); *see also Lazare Kaplan, Inc. v. Photoscribe Tech., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) (finding waiver of claim construction argument that was brand new and made for the first time on appeal) (internal citations omitted).

Nassau never raised the doctrine of equivalents argument at the district court and, in fact, the parties' summary judgment briefing fails to even mention – let alone discuss – the doctrine of equivalents at all. Nassau admits as much by pointing only to a snippet from its expert's report – rather than its briefing to the district court – to support its recent position. (NB at 48) Because Nassau failed to raise this argument below, this Court should not consider it now. *See Bogle-Assengai*, 470 F.3d at 504; *Allianz Ins. Co.*, 416 F.3d at 114; *Aslanidis*, 7 F.3d at 1077; *see also Lazare Kaplan*, 628 F.3d at 1376 (internal citations omitted).

Further, to the extent this Court chooses to consider statements buried in Nassau's expert's report, the doctrine of equivalents still does not save Nassau's case. A proper doctrine of equivalents assessment requires an analysis of the accused process, in light of the asserted claim, *on an element-by-element basis. See Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1322 (Fed. Cir. 1999) (affirming summary judgment of no infringement on doctrine of equivalents as matter of law in part because plaintiff failed to conduct requisite "objective inquiry on an element-by-element basis"), *citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 28-29 (1997). In lieu of such an analysis, however, Nassau's expert only asserts that the accused products "infringe[] both claims 1 and 2" under the doctrine of equivalents because they:

> perform[] substantially the same function . . . to lower the center of
> gravity and spread the weight low in the toe and heel of the club; in

29

> substantially the same way . . . removing weight from the center portion of the topline of the club head and relocating the same or equivalent amount of removed weight low to the heel and toe portions of the club head; to achieve substantially the same result . . . to increase the launch angle to attain a higher trajectory of a struck ball, and to increase the distance and accuracy of a struck ball on off-center hits.

(JA639-40)

Not only does Nassau's expert fail to discuss the elements of the asserted claims separately, he also appears to remove certain claim elements altogether from his improperly generalized function-way-result analysis.  For example, he makes no reference to the "no adverse consequence" limitation in Claim 1, while apparently attributing the result of "higher trajectory" to both claims, even though it does not appear in Claim 2.[9]  Parente's "analysis" also fails because, as with his literal infringement opinion, he substitutes, without justification, "removing weight" for "removing construction material," even though the latter formulation is required by the claims.  Likewise, he fails to even discuss, let alone analyze,

---

[9] In fact, Parente's function-way-result description appears to be an inexplicable hybrid of Claims 1 and 2.  For example, only Claim 2 requires "construction material" to be taken from a "central portion" – Claim 1 recites removing construction material from the "top surface."  Similarly, Claim 1 discusses relocating the construction material to "clearance positions . . . adjacent opposite ends of [the] bottom surface," while Claim 2 describes relocation of construction material to "selected bottom areas of [the] heel and toe."  These differences between the claims are not recognized in the hybrid claim presented in Parente's doctrine of equivalents opinion.

the process actually employed to design and/or manufacture the heads of the Accused Clubs, much less explain why this process should be viewed as equivalent to the amalgam of the claims he describes.[10]

## III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT ON CLAIM 2 OF THE '000 PATENT

The language of Claim 2 requires that the weight of the "removed" construction material be the same as the weight of the "relocated" construction material: "removing construction material from a central portion of [the] top surface, *determining the weight of said removed construction material*," and "embodying as part of [the bottom of the club] *said removed construction material having said determined weight*." (JA52 (4:33-45)) (emphasis added) The redistribution of material is also made "without any increase in the overall weight of the club head." (*Id.*) The ordinary meaning of these limitations requires that *all* of the construction material removed from the club head be embodied in the selected bottom areas, with no additional weight added elsewhere on the club head. (*Id.*)

After analyzing the plain language of the claims, the district court agreed and concluded that Claim 2 requires that "*all* of the construction material or weight removed . . . be embodied in selected bottom areas." (JA44) (emphasis in original)

---

[10] Acushnet's expert's report provides additional reasons why Parente's opinion on the doctrine of equivalents is fatally flawed. (JA477-80)

31

Turning to the Accused Clubs, the district court found that "each of the Accused Clubs incorporates a lightweight polymer insert along the top surface of the club head." (JA44-45) This insert, the district court concluded, "replaces an equivalent volume of construction material, and the difference in weight between the insert and the removed construction material is then redistributed to the bottom areas of the club head." (*Id.*) In other words, although the design, according to the district court, cut out and removed a channel of metal from the topline of the club head, "some of that weight remains in the design of the club head topline in the form of a polymer insert." (JA45)



(JA651) (annotations omitted) In granting summary judgment on Claim 2, the district court ruled that, "[b]ecause the design method of the Accused Clubs indisputably does not involve relocating all of the determined weight from the top to the bottom of the club, Plaintiffs cannot show [that] the Accused Clubs infringe Claim 2 of the '000 Patent." (JA45)

Nassau dedicates almost twelve pages of its appellate brief responding to this issue. (NB at 38-50) Nassau's first problem, however, is that it never offered

*any* response to Acushnet's argument, either in its papers or at oral argument, during the district court proceedings. In fact, Nassau remained silent even after Acushnet brought that silence to the district court's attention in its reply papers *and* at oral argument. (JA1660; JA1662-65; JA1713 (24:14-22); JA1735-40 (46:2-51:17)) It is highly improper for Nassau to suggest that the district court erred in failing to consider an argument that Nassau never made. *See Bogle-Assengai*, 470 F.3d at 504; *Allianz Ins. Co.*, 416 F.3d at 114; *Aslanidis*, 7 F.3d at 1077; *see also Lazare Kaplan*, 628 F.3d at 1376 (internal citations omitted). Nassau therefore has waived its right to raise this new argument for the first time on appeal. *See id.*

Even if Nassau's argument is considered, however, that analysis only serves to show the fundamental flaw in Nassau's overall approach. Nassau argues that the district court should not have considered the weight of the polymer insert in its analysis because "the polymer insert is clearly a part of the construction of the club." (NB at 41) In other words, Nassau maintains that the insert is not "added weight," but is part of the construction material that was never removed. (*Id.*)

It is this argument that reveals the underlying fallacy of Nassau's entire case. As previously discussed, Claims 1 and 2 are method claims that require that "construction material" be "removed." Nassau's arguments, however, focus on a physical attribute of the club head: the presence of a channel in the steel in the topline of the club head. (NB at 36) Nassau's theory is that material that used to

33

be in that channel has been relocated lower in the head. (NB at 41-44) In other words, whether during design or manufacturing, at one point construction material was in that channel, and later it was gone.

Revealingly, Nassau's "determined weight" argument shows the fallacy of this unsupported supposition. For purposes of its "determined weight" argument, Nassau considers the polymer insert to be part of the original, non-removed construction material. (NB at 41) Put another way, Nassau argues on the one hand that construction material was "removed" to create the channel, but argues on the other hand that the *later*-inserted polymer is part of the original "construction material."

Nassau is able to engage in this sleight-of-hand because it never performs a proper analysis in the first instance. Whether in the context of manufacturing or design, Nassau never details a process whereby material that used to be in the channel in the topline is actually removed and relocated to lower positions. For that reason, Nassau can, and does, call anything it wants "construction material," and unilaterally decides whether that material has remained in place or was "removed" and "relocated." As such, its claim that the polymer insert is part of the "unremoved" construction material is without basis.

Nassau makes other errors as well. Nassau contends that "determined weight" can be construed to mean nothing more than the weight that is relocated

34

(and something less than the weight removed).[11]  (NB at 41)  The problem with this argument is found in the language of the claims themselves.  First, "construction material" is "removed."  Second, it is the weight of that construction material that is "determined."  Third, it is that same "construction material" – with its "determined weight" – that is relocated elsewhere in the club.  There is nothing in the language of the claims that suggests, as Nassau contends, that the "determined weight" is anything other than the weight of the physically "removed" construction material.

Nassau also suggests that the district court improperly considered only part of its expert's testimony, and ignored that portion of his opinion which states that the "discretionary weight" limitation is met by the net difference between the weight of the "removed" construction material and the weight of whatever replaces it.  (NB at 41-44)  Parente admits, however, that his reading of the claim limitation is not based on the language of the claims – or any other intrinsic evidence – but is only his "opinion."  (JA572-73 (283:24-288:2))  This Court has repeatedly emphasized that unsubstantiated opinions of experts, particularly when they are at odds with the intrinsic evidence, should be given no weight in claim construction.

---

[11] For example, if the "removed" steel weighs ten ounces and the polymer insert that is put into the channel weighs two ounces, then, according to Nassau, the "determined weight" is eight ounces.  Because, according to Nassau, the eight ounces is "relocated" elsewhere in the head of the Accused Clubs, the "determined weight" limitation is met.  (NB at 41-44)

*See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) (expert testimony properly not accorded any weight where it conflicted with intrinsic evidence); *see also Davis*, 596 F.3d at 1364; *Rohm and Haas Co.*, 127 F.3d at 1092.  Contrary to Nassau's claims (NB at 44, 47), Parente's naked opinion does not create a genuine issue of material fact.[12]  *Rohm and Haas Co.*, 127 F.3d at 1092.

As the district court found, there is no dispute that "each of the Accused Clubs incorporates a polymer insert along the top surface of the club head," that such insert would, at best, replace an equivalent volume of construction material, and that the "difference [in weight] between the insert and the [removed] construction material" is the most that could be redistributed.  (JA44-45)  In fact, Nassau admits as much; its alleged evidence of infringement focuses on the relocation of the "weight differential" between the removed steel and the polymer that is inserted.  (NB at 44-47)  Summary judgment of noninfringement of Claim 2 therefore was appropriate, and this Court should affirm the district court's decision.

---

[12] Nassau's suggestion that claim construction issues present a "genuine issue of material fact" is, at best, confusing.  As this Court is well aware, claim construction is a matter of law – not fact – for the courts –not the jury – to decide. *See, e.g.*, *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1315 (Fed. Cir. 1999) (finding no infringement), *referencing Cybor Corp.*, 138 F.3d at 1456.

## IV.    ACUSHNET IS ENTITLED TO SUMMARY JUDGMENT ON CLAIM 1 OF THE '000 PATENT

For three reasons, the district court's grant of summary judgment with respect to Claim 1 of the '000 Patent was correct.  First, Nassau has not, and cannot, show that the Accused Clubs meet the "from a location not used during ball-striking service" limitation.  Second, the "no adverse consequence" limitation is indefinite and, as a result, cannot be infringed.  Third, even assuming that the "no adverse consequence" limitation can be construed, testing is necessary to determine if the limitation has been met, and Nassau has admittedly not performed any testing.

### A.    The Accused Clubs Do Not Meet the "From a Location Not Used During Ball-Striking Service" Limitation

The district court correctly concluded that the Accused Clubs do not meet the "from a location not used during ball-striking service" limitation of Claim 1. (JA41-45)  The Accused Clubs indisputably have a channel in the center topline area of the club head which, according to Nassau, was once filled with steel and then replaced with a polymer insert.  That channel undisputedly sits behind a face at the center topline.  (JA518 (¶ 4); *see also* NB at 36)  The undisputed record similarly establishes that balls are struck on the face at that area of the club head.  (JA519 (¶ 6, Tab A))  As such, material is "removed" from a location that *is* used during ball-striking service.

37

Nassau argues that the district court was wrong because its construction reads out the preferred embodiment, which has a concave shape (phantom perspective 38) at the topline.



(JA50 (Fig. 7))  In fact, the opposite is true.  By removing both the material from behind the face *as well as the face itself*, the center topline area in the preferred embodiment is no longer a location "used during ball-striking service."  As such, the preferred embodiment clearly meets this limitation.

## B.    Acushnet Does Not Meet the "No Adverse Consequence" Limitation

According to Claim 1, construction material must be removed with "no adverse consequence thereto."  (JA52 (4:16-32))  Not only is the "no adverse consequence" limitation hopelessly indefinite, but Nassau has not, and cannot, establish that the Accused Clubs satisfy Nassau's own construction of the limitation.

### 1.    The "No Adverse Consequence" Limitation is Indefinite

Indefiniteness turns on "whether those skilled in the art would understand what is claimed."  *Morton Int'l Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993) (citation omitted).  In other words, a claim is indefinite if "an

ordinarily skilled artisan at the time of the invention would not have known the scope of [the claim term]." *Amgen Inc. v. F. Hoffman-LA Roche Ltd.*, 580 F.3d 1340, 1372 (Fed. Cir. 2009). Because indefiniteness "is inextricably intertwined with claim construction," the question of whether Claim 1 of the '000 Patent meets the statutory requirements for definiteness is properly before this Court.[13] *See S3 Inc .v. Nvidia Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001); *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1379 (Fed. Cir. 1999).

The "no adverse consequence" limitation fails for indefiniteness. A limitation is indefinite if it requires a subjective determination that depends upon "the unpredictable vagaries of any one person's opinion." *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) (finding "aesthetically pleasing" to be indefinite as subjective and, as result, does not "notify the public of the patentee's right to exclude."). As this Court has explained, "[w]hen a proposed construction requires that an artisan make a separate infringement determination for every set of circumstances in which the [invention] may be used, when such determinations are likely to result in different outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite." *Haliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008).

---

[13] Acushnet also raised this indefiniteness argument below. (JA267-68)

Such is the case here.  When pressed to explain what actually constitutes an "adverse consequence" as that term is used in Claim 1 of the '000 Patent, Parente makes three glaring admissions.  First, he admits that the '000 Patent's disclosure provides no guidance.  (JA569 (263:15-21) ("**Q.**  Is there something in the patent that tells us . . . the definition of an adverse consequence?  **A.**  *No.*  Adverse consequence in the patent is just – it's up to you to understand."); JA570 (266:6-13) ("**Q.**  There's no guidance in the patent[?]  **A.**  There's no defining of the terminology, no.")) (emphasis added)  Second, Parente admits that determining whether an "adverse consequence" exists requires an entirely subjective determination that changes from player to player, club to club, and even shot to shot.  (JA569 (264:15-23) (adverse consequence "*is pretty much decided by the individual.*  **Q.**  So . . . two different people of skill in the art can have two different definitions of . . . an adverse consequence . . . ?  **A.**  *They could vary.*")) (emphasis added)  Finally, Parente admits that each golfer him or herself can determine whether a club head suffers from an "adverse consequence" based merely on *looking at the club*.  (JA569-70 (265:24-268:4)) (emphasis added)[14]  Indeed, the

---

[14] Interestingly, Nassau cites this testimony and other statements by Parente to support *its* position, concluding that "[t]hat is the way the patent should be read, and would be read by a person of ordinary skill in the art."  (NB at 31-32)  Nassau's argument, however, misses the point.  It is precisely *because* "adverse consequence" varies from club to club and golfer to golfer that the limitation is indefinite.

dictionary definition of "adverse consequences" – "negative, unpleasant, or harmful" – demonstrates just how variable and subjective this term can be.  *See Macmillian Dictionary* at http://www.macmillandictionary.com/us/ dictionary/american/adverse (last visited Dec. 17, 2013).  Put simply, whether a golf shot has an "adverse consequence" is entirely in the eye of the beholder.

Such individual variation is the "epitome of indefiniteness" because the claim's scope is subject to individual opinion.  *Geneva Pharma, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1383-84 (Fed. Cir. 2003).  The fundamental problem is that Acushnet could perform the exact same method and meet this limitation with one golfer but not with the next.  Under such circumstances, a person of ordinary skill in the art is not able to determine the metes and bounds of the claim because she would have no idea whether, when practicing the same method, a particular golfer will subjectively experience "no adverse consequence," some "adverse consequence," or serious "adverse consequence."  *See, e.g.*, *Amgen*, 580 F.3d at 1372.

This subjective unpredictability is why "a claim term, to be definite, requires an *objective* anchor."  *Datamize,* 417 F.3d at 1350 ("some *objective* standard must be provided in order to allow the public to determine the scope of the claimed invention.") (emphasis added).  The '000 Patent's specification provides no such

objective understanding.[15]  Because the "no adverse consequence" limitation of

Claim 1 of the '000 Patent is indefinite, Acushnet cannot be found to have

infringed that claim.  *See Honeywell Int'l Inc. v. Int'l Trade Comm'n*, 341 F.3d

1332, 1342 (Fed. Cir. 2003) ("Because the claims are indefinite, the claims, by

definition, cannot be construed.  Without a discernible claim construction, an

infringement analysis cannot be performed.") (internal citations omitted).

**2.    The "No Adverse Consequence" Limitation is Not Met Where Nassau Failed to Test the Accused Clubs for That Limitation**

Regardless of whether the term can be construed, the "no adverse

consequence" limitation at least requires that there be no negative result as a

consequence of the removal and relocation of construction material.  As a matter of

physics, however, the removal of steel in the topline of a club head is going to have

consequences.  (JA1670-71 (¶¶ 3-4))  Hitting the ball where there once was steel

and now only a polymer insert is certainly going to yield a different result.  In

addition, the resulting lower center of gravity when the material is (allegedly)

relocated means that some golf shots will fly higher in the air, but they also will

---

[15] This deficiency is only accentuated by the confusing grammatical structure of Claim 1, which provides no indication whether "no adverse consequences *thereto*" modifies "a location," "ball-striking service," "said golf iron," or "adjacent opposite ends of said bottom, [sic] surface."  Parente implicitly acknowledges this difficulty by, without explanation, excising the word "thereto" from his discussion of this claim limitation.  (JA637-38)

travel shorter distances.  (JA1671 (¶ 3-4); *see also* JA537 (36:7-25); JA659 (202:4-203:6); JA660 (206:7-207:9); JA662 (215:8-22); JA663 (219:9-20))

For golfers, sacrificing distance for height for a particular shot may be very undesirable.  (JA1670-71 (¶¶ 3-4))  Lowering the center of gravity of a golf club head, therefore, may result in any number of potential undesirable consequences.

As Nassau's expert admits, the only way to assess whether the inevitable "consequence" is "adverse" is to test for it:

> Q:    So would there be any way of knowing – of being certain if you're a manufacturer of golf clubs as to whether or not your design results in an adverse consequence?
>
> A:    ***Player testing in addition to robot-testing is a must.***  And it will usually show you design flaws or adverse consequences.  So you test players of all skill levels to find out if . . . your golf club will produce adverse consequences . . . .

(JA569 (264:25-265:12)) (emphasis added)

Parente admits, however, that he did no such testing:

> Q:    When you did your infringement analysis, you didn't do any of this testing that you just described on the clubs; is that right?
>
> A:    No.  I did not do player-testing.

(JA570 (266:14-20))

Nassau never disputed any of this evidence, nor suggested that Parente was incorrect in his assessment of what was necessary to establish whether Acushnet practiced the "no adverse consequence" limitation.  (JA1661-62)  As such, Nassau has not – and cannot – raise a genuine issue of material fact as to infringement of

Claim 1 of the '000 Patent, and the district court's entry of summary judgment on that claim was appropriate.

Nassau attempts to overcome this fatal flaw by citing to the '757 Patent. (NB at 32) Nassau argues that the language in that patent establishes that the removal of material from the topline has "no adverse consequence." (*Id.*) Nassau misreads that patent, however, which is directed toward the use of different materials in a golf club head. (JA1367 (2:49-51); *see generally* JA1347-76) The statements that Nassau cites do not specify the portion of the club head relevant to this case (the topline portion). Rather, those statements relate to any material that is not "required to maintain [the] structural integrity" of the club head. (NB at 32; JA1367 (2:56-59)) Indeed, the '757 Patent's specification does not state that the removal of *any* material results in "no adverse consequence," as Nassau contends. Rather, while the '757 Patent's specification lists the potential benefits of removing material ("increase the overall size of the club head, optimize the club head center of gravity, produce a greater club head moment of inertia, and/or expand the size of the club head sweet spot") (JA1367 (2:62-65)), it also identifies adverse consequences resulting from removing this material. (JA1367 (2:4-20)) Specifically, while a "more forgiving club" with a larger "sweet spot" may help the beginner or average

golfer, the altered club head would be *adverse* to the skilled golfer.[16]  (*Id.*)  Thus, nothing in the '757 Patent's disclosure stands for the proposition that the removal of the topline portion of a golf club's head will always result in "*no* adverse consequence," as Claim 1 requires.  Finally, there is *nothing* in the record that demonstrates (or even suggests) that, even if the '757 Patent did disclose a way to make golf clubs that have "no adverse consequence," Roach adhered to the patent in designing the Accused Clubs.  (JA717 (32:22-33:5); JA719 (44:25-45:2); JA725 (80:11-19); JA518 (¶ 4); JA468-70 (¶¶ 44-46); JA721 (57:13-19); JA1171 (41:6-23))

According to Nassau, Acushnet also meets the "no adverse consequence" limitation because it removed material only from the "top edge" of the heads of the Accused Clubs and, "for all practical purposes," a hit at that location "never occurs."  (NB at 31)  That argument, however, contradicts both Nassau's own claims and the record evidence.  First, Nassau claims that two clubs (of the four accused) infringe Claim 1 even though those clubs allegedly "remove" material from the upper and middle portions of the toe:



---

[16] Roach, a listed inventor on the '757 Patent, confirms that club features that may benefit one golfer may be adverse to another.  (JA1670-71 (¶¶ 3-4))

(JA1666)  Indeed, the '000 Patent itself discloses that the removal of material from the toe region results in an adverse consequence.  (JA52 (3:52-4:6))  As such, Nassau's new argument is contradicted by its own claims.

Second, the uncontroverted evidence demonstrates that golfers, in fact, hit golf shots using the "top edge" of a golf club.  The scatter chart below contains aggregated data from a large number of actual golf shots across multiple golfers using multiple clubs.  (JA519 (¶ 6, Tab A))  That data shows that golfers strike the top edge of a golf club with frequency.  The "vertical impact position" on the chart correlates with the exemplar club head below; the horizontal "0.5" line in the chart maps to the "0.5" line in the club.  As seen below, the chart clearly shows that golfers routinely hit balls in the top edge area of the club head.





(*Id.*)  Indeed, Parente, Nassau's own expert, admits that it is "not uncommon" for golfers to hit a ball at the top of the club head.  (JA570 (268:8-14))  As a result, Nassau's attempt to support its infringement position has no factual underpinning.

Further, in light of the uncontroverted record, Nassau's infringement theory, if accepted, would result in an enablement problem.  *See, e.g.*, *Cordis Corp. v. Medtronic Ave., Inc.*, 511 F.3d 1157, 1174 (Fed. Cir. 2008) ("a construction that renders the claimed invention inoperable should be viewed with extreme skepticism") (citation omitted);  *Honeywell Int'l, Inc.*, 341 F.3d at 1341 ("an inoperable claim construction would render the claim invalid for lack of enablement") (citation omitted); *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999) ("we should attempt to construe the claims to preserve their validity") (citations omitted).  Because players regularly strike a golf ball at the top of a golf club head, removal of weight from that area *necessarily* results in at least some poor golf shots (or "adverse consequences").  Claim 1, however, requires that there be "no adverse consequence" at all.  Therefore, determining whether an "adverse consequence" exists must be more than simply looking at the location where the material is removed.  If the term can be defined at all, its existence can only be established through proper testing.  (JA569 (264:25-265:12))

47

### C.   Under Nassau's Construction, Half of the Accused Clubs Cannot Meet the "From a Location Not Used During Ball-Striking Service" and "No Adverse Consequence" Limitations

Nassau argues that "the '000 Patent clearly teaches that weight should *not* be removed from the toe of the club head.  (NB at 26) (emphasis in original) According to Nassau, because the '000 Patent specification states that "toe hits" are common, removal of construction material from that location would both result in an "adverse consequence" and would not be "from a location not used during ball striking service."  (NB at 26, 30-31)

Yet two of the Accused Clubs – the S9 Second Generation and the S2 – "remove" material from the "toe" area of the club.

S9 Second Generation:



S2:

As such, under Nassau's new view of the '000 Patent claims, Acushnet has "removed" "construction material" from "locations" that *are* used "during ball-striking service," and that removal will, by the '000 Patent's own statements,

constitute "adverse consequence."  At a minimum, therefore, there can be no infringement by two of the four Accused Clubs.

## V.    CONCLUSION

For the aforementioned reasons, Acushnet respectfully requests that this Court affirm the district court's grant of summary judgment in favor of Acushnet and find that Acushnet does not infringe and has not infringed Claim 1 or Claim 2 of the '000 Patent.

December 20, 2013                         Respectfully submitted,

                                          ___/s/ Joshua C. Krumholz_____
                                          Joshua C. Krumholz
                                          Benjamin M. Stern
                                          HOLLAND & KNIGHT LLP
                                          10 St. James Avenue
                                          Boston, MA 02116
                                          (617) 523-2700

                                          *Attorneys for Defendants-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 11,211 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in Times Roman 14-point font.

Respectfully submitted,

 /s/ Joshua C. Krumholz
Joshua C. Krumholz
Benjamin M. Stern
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

*Attorneys for Defendants-Appellees*

# United States Court of Appeals
## for the Federal Circuit

## CERTIFICATE OF SERVICE

Nassau Precision Casting Co., Inc. v. Acushnet Company, Inc., et al. 2013-1410

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by HOLLAND & KNIGHT LLP, Attorneys for Defendants-Appellees to print this document.  I am an employee of Counsel Press.

On **December 20, 2013**, Counsel for Appellant has authorized me to electronically file the foregoing **Brief for Defendants-Appellees** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Sidney R. Bresnick, Esquire
> Dariush Keyhani, Esquire
> Meredith & Keyhani, PLLC
> 330 Madison Avenue, 6th Floor
> New York, NY  10017
> (212) 760-0098
> Attorneys for Plaintiff-Appellant

A courtesy copy will be mailed upon approval of court.

Upon acceptance by the Court of the e-filed document, six paper copies will filed with the Court, via Federal Express, within the time provided in the Court's rules.

/s/ Robyn Cocho
Counsel Press

51